All right. Appeals 142811, 143189, 143684, United States v. Anthony Lomax et al. Good morning. May it please the Court, Mario Garcia for Anthony Lomax. Mr. Anthony Lomax raises two issues on appeal. First, whether the evidence was sufficient to convict him of conspiracy. And second, whether he was denied a fair trial when the district court failed to give the bi-cell jury instruction. For purposes of our conversation today, I'm going to focus on the second issue with respect to whether or not he was provided a fair trial when the jury instruction was not offered. I'm sorry, not presented to the jury. We believe he was, in fact, denied a fair trial. We believe there was ample evidence from which a rational juror could have found that Anthony Lomax was merely in a bi-seller relationship with the other defendants. Would the evidence that Anthony accompanied Brandon in some of his drug transactions and was visibly armed at those times indicative at all of a conspiracy between them rather than a buyer-seller? Sir, I certainly think that that evidence could fall on the side of the conspiracy. But I think, as we note, there was ample other evidence from which one could consider this was merely a buyer-seller relationship. And because the jury was not given the opportunity to consider that, they were never instructed on that relationship, they could not decide whether or not he, in fact, was on a bi-cell relationship side or on a conspiracy side. So what was the evidence that suggests an arm's length? Brandon Lomax is the supplier and Anthony Lomax is the customer in that relationship. And what, in your view, is the evidence that that was just an arm's length bi-cell relationship? Yes, certainly. So first of all, Anthony Lomax was not the one who was primarily receiving the drugs that were coming into Indianapolis. That was Brandon Lomax and DeMond Glover, and I think the evidence is pretty clear on that. Second, Anthony was only receiving the drugs from Brandon Lomax. There was some evidence he had some hand-to-hand interaction with DeMond Glover, but I don't think there was any direct evidence that he had received any drugs from Mr. Glover. Third, most importantly, I think, Your Honor, is the fact that on at least one occasion, Anthony Lomax tried to compete with Brandon Lomax over drug sales. He approached Mr. Johnson and said, hey, don't buy your drugs from Brandon, buy them from me. And we believe that that is a clear indication that he was more on the bi-cell relationship or on the other side of the transaction than on the same side as Brandon Lomax. Why does that tell us anything about the Brandon Lomax, Anthony Lomax transactional relationship? If Anthony Lomax also has another supplier and wants to sell to other customers, why does that shed any light on buyer-seller as to Brandon Lomax and Anthony Lomax? Sure. I don't believe there was any other evidence that Anthony Lomax was receiving drugs from anyone other than Brandon Lomax, substantially other than Brandon Lomax, and it shows a direct competition. If you're in a conspiracy to distribute drugs and you're working together, you're not going to be working adverse to Mr. Lomax. And I believe the witnesses testified that they, that Brandon Lomax, I'm sorry, that Anthony Lomax would not have wanted Brandon to know that he was trying to undercut his business and sell directly to Mr. Johnson. For the most part, they did not have the same customers, that Brandon and DeMond Glover were not present when Anthony Lomax was selling drugs in the controlled buys, that out of the dozens and dozens of calls and texts that the government introduced, for the most part, Anthony Lomax did not communicate with DeMond Glover, and that Anthony's close relationship to DeMond Glover and Brandon Lomax was equally indicative of them being familial, being part of the same family, as much as it was that they were in a conspiracy. For those reasons, we believe that the instruction should have been given because there was ample evidence from which a rational juror could decide that he was in a buy-sell relationship, and because they weren't given the opportunity to distinguish between those two types of relationships, we believe that he was denied a fair trial. As this court noted in a recent opinion in Cruz, which was not that was a November 3rd opinion, Cruz, C-R-U-S-E, this court has never found that the failure to give a buy-sell instruction is harmless error, and that's because it highlights the importance of making sure that when there is the opportunity to offer both instructions, it should, the court should offer both instructions, and that as a result, in this case, Anthony was denied a fair trial. We would ask that the conviction on count one be vacated, and that the matter be remanded on count one for a new trial for Mr. Lomax, and for resentencing on the remaining counts. Thank you. Good morning. Good morning. May it please the court, Mrs. Brady. Your Honor, I'd like to focus in, if I could, on sufficiency of the evidence argument as it relates to DeMond Glover. DeMond Glover was involved in drug transactions, and I think the record is fairly clear, given the people that he interacted with, that he was doing drug transactions. Regarding the sales of heroin by Glover and Anthony at Sprayum Auto, did those sales occur inside the business, or in the parking lot? I can only speak to the Glover sales, and those were outside in the parking lot. That's not a parking lot. It was a parking lot that was adjacent to many businesses, and that they all shared. It was not just a specific parking lot that related to Sprayum Auto body shop. As it relates to DeMond Glover, I think it's pretty clear that he was involved in the Indianapolis community. When you look at the record, it's very clear that he worked with Terry Scruggs and Parrish Glover, who was, in fact, his sister. His organization was separate and apart from the other two individuals involved in this case. The government did a great job in tying that up as it relates to the Michael Barnett, who was listed inside the transcripts. You saw that they did control buys with him, so it showed a clear relationship, a pattern of conduct, as it relates to DeMond Glover, that he was buying and selling drugs within the community. Now, his supplier came all the way from Chicago. The individual's name, I believe, was Tyrone Dotson, and he had an individual who would be his mule and his runner who would bring drugs down to Indianapolis, specifically to DeMond Glover. What I'm trying to do is show this was a separate organization from the other two in Brandon and Anthony Lomax. They talk amongst themselves about certain drug transactions, and why isn't that enough when we're looking at this from a sufficiency of the evidence perspective to infer some agreement amongst the three of them? Well, Judge Shaw, I believe that because of their familial relationship, that they would talk about a lot of different things. When we look at the actual seven calls that related between, four calls between DeMond Glover and Brandon Lomax, and three calls between Anthony Lomax and DeMond Glover. In those calls, and also there were some additional text messages that came through as well. So when you say communicated, there is an instance in which Brandon Lomax asked DeMond Glover to be able to borrow 50, and it appears as though he is talking about something that is carefully missed in this instance, is that there was no response from DeMond Glover in the text message. There certainly was none offered that I recall during the course of the testimony that suggested he received the text, he acknowledged the text, and used the text. Now, Brandon Lomax also went over to DeMond Glover's house. He would take the people that he was buying drugs and selling drugs to and from over to DeMond Glover's house. I think that this is indicative of a ruse that any drug dealer would use to deflect where they possibly are storing their drugs under any circumstance. It doesn't necessarily mean, because he goes into DeMond Glover's house and comes out and gives him the drugs, that the drugs were actually located at DeMond Glover's house, and or that DeMond Glover actually knew about the drugs that would be there. That would be a pretty risky proposition to use as a ruse if you're not, if Mr. Glover is not in the loop on the fact that his place would be used for those purposes. That would be pretty risky for Brandon Lomax. I certainly agree, Your Honor, but I would say the drug game is a terrible game. It's something that's very dangerous, and it's something that they, it's not above, not below them to use those sort of tactics. I see my time is up. All right. Oh, I guess I'm down to two minutes. I'm sorry. If I could, if I could draw a quick analogy between Costco, Sam's Club, and BJ's Wholesale Warehouse. Each of them are engaged in the business of selling products. They all sell similar, similarly situated products. Under these instances, sometimes they have the same customers that shop at each of the locations. These individual businesses also use the same suppliers or very similar suppliers. So the fact that we have some overlap is going to be expected in any business that is there when there's limited opportunities to purchase drugs at the wholesale level and then distribute them at the retail level under those circumstances as well. So I think because they were raised together and had such a close relationship, it made it appear certainly to the jury that if you see all these drug transactions taking place that they must conclude that there somehow is a conspiracy between them. There is no hub and spoke conspiracy. My time. Thank you. Okay, Ms. Brady. May it please the court, counsel. I'm Michelle Brady on behalf of the United States. If I may first address the sufficiency of the evidence argument that's been made. Certainly the government would acknowledge this was a very difficult case for the ATF to investigate for a couple of reasons. One, as is very clear, several of these co-conspirators including the three that went to trial were not just drug co-conspirators. They were family. They'd known each other their whole lives. Also difficult in this case as the evidence was presented at trial. This was a conspiracy that began back in 2009. It was not. What evidence is there of mutual benefit to Glover, Brandon, and Anthony as opposed to being friendly competitors? For instance, if Brandon borrows $50,000 from Glover but has to pay it back, what evidence is there of a mutual benefit that would indicate a conspiracy? Well, the benefit there, Your Honor, would be that Brandon Lomax did not risk losing a customer. He knew he had DeMond Glover to rely upon. If Brandon was out of heroin, no problem. He could go to DeMond Glover's stash of heroin, take that 50 grams of heroin, distribute it to the customer who couldn't wait per that text message that Your Honor is referring to. Got somebody, won't wait, is what Brandon says. And so he's able to continue on with his business and not risk losing customers. But if one person is out of heroin and rather than leave his customer disappointed, he refers him to his cousin, who is also a dealer, does that make the conspirators even absent and intent to further the other's business? I don't know that that's what happened here. I'm not sure if Your Honor is referring to the testimony from Marcus Perry. He said that he only dealt with Brandon Lomax. The only person he ever bought from was Brandon Lomax. On one occasion, Brandon was not reasonably situated where he could get the heroin to Marcus Perry. So what Brandon does is say, don't worry, go to Spram, Anthony will give it to you. It was still Brandon's heroin. That was Marcus Perry's understanding. As far as he knew, he only ever bought from Brandon. So that I think is the key point there, Your Honor. When you are on the same side of the transaction as clearly occurred here, there's no buyer-seller. Buyer-seller is irrelevant. Brandon and I should say Anthony assisted Brandon in Brandon's distribution of heroin on that occasion. Just as when Anthony would repeatedly drive Brandon to drug transactions or also just merely accompanied him doing so while visibly armed to those customers, that is not a buyer-seller. Anthony and Brandon are on the same side. But there are other transactions where Anthony is selling to customers that don't appear to be the same pool of customers available to Brandon. And that supply that Anthony has available is coming from Brandon. So there could be a buyer-seller relationship between Brandon and Anthony, and then Anthony sells to other customers. The government submitted a buyer-seller instruction is never harmless. And you might want to talk about that aspect of the Cruz decision. I would, Your Honor. I believe that the, and I could be mistaken, my understanding of the Cruz decision is that when the buyer-seller instruction would be appropriate, then it would not be harmless error. It didn't say that whenever there's some small sliver of the evidence presented that there is also, of course there's going to be elements of buyer-seller. It's a drug distribution conspiracy. But what the Cruz case, I believe, stands for is the fact that buyer-seller is irrelevant if both parties, as occurred here with Anthony and Brandon, are on the same side of the transaction. And giving an irrelevant instruction, I believe the Cruz case indicated, would only serve to confuse the jury and should not occur if the facts don't warrant it. You seem to suggest, though, in that 28J letter, there was some evidence of a buyer-seller relationship between Brandon and Anthony. Why isn't that evidence sufficient? Because there is more than that. I think, for example, in the reading of that decision, it was ambiguous. It could have cut either way. We don't know. There was certainly the buyer-seller between those two defendants. It was simply ambiguous as to whether there was more to it than that. Whether that buyer-seller relationship could also constitute a conspiracy. And that's simply not what we have here. It is very clear from the evidence at trial there was more than a buyer-seller. They were on the same side of the transaction in numerous ways. Anthony accompanying Brandon to drug deals while visibly armed. Anthony bringing Brandon Lomax to drug deals while visibly armed. Anthony distributing on behalf of Brandon when Brandon couldn't get his There was much more than just the ambiguous evidence that could have cut both ways. So if you just have that ambiguous evidence, certainly buyer-seller would be appropriate for a jury to try to make that determination. But that's simply not what happened here. It was very clear cut. They were on the same side of the transaction. As Cruz indicates, in that situation, buyer-seller is irrelevant. And giving an irrelevant instruction is inappropriate as that would only serve to confuse the jury. What benefit did Anthony Lomax get from Glover selling? Well, I think that as briefed, there was more of a hub and spoke that really the main benefit came from that geographical location that all three were allowed to use. There was some evidence, certainly, that they did deal together. There was one occasion that I can think of, I believe was briefed, where all that was said by Glover was, swing by aunties, while the case agent who was investigating knew, hey, that's something significant based on the wiretap calls that occurred up to that point, goes out, tracks them down, and sees in broad daylight in the middle of the street, the two of them conduct a hand-to-hand in the middle of the street. I believe the testimony was Glover distributing to Anthony. On another occasion, there was a phone call, again, because of the long-standing relationship between the parties, extremely brief, I think it could have been as coded as, slide down on me, demand, giving him an instruction, hey, come on down. What is the benefit? It is, again, the larger scope sort of focused, certainly, on that Spram Auto, focused on Brandon's serving as the center of that hub, but certainly all three of them were entitled to utilize that Spram Auto as a safe zone where they knew they could distribute heroin, and that's, of course, not a benefit you give to a competitor. You don't let your competitor sell heroin on your property. You do that to someone you're in an agreement with, in a joint Wasn't a parking lot shared by a number of businesses? That was not, well, there were a couple of poll cameras, Your Honor, on two different parts of the business. My recollection from the trial is that certainly DeMond Glover, when he dealt from his car, his van, dealt from more behind the business. There was nothing behind that business other than, I believe, a tree line, if my memory serves from the poll camera video. I believe that was, very strictly speaking, Spram Auto. There was also the front of the business that there was a poll camera on, but I know, my recollection is that the poll camera evidence that was introduced at trial was certainly of the back, which would make more sense. You're certainly not going to expose yourself to the extent you don't have to if there is that more hidden area sort of behind the business, to the side and behind the business. So no, it wasn't a parking lot that anybody, any other business would come to. No, Your Honor, that's not my recollection of the evidence. I don't know. It seems to me that, particularly as to Glover, the evidence of coordination or cooperation is really minimal here. I'd like to speak to that. One, certainly, I think you can't underestimate how he utilized Brandon Lomax's Spram Auto business to deal drugs out of. We know that when he took, I'm sorry, when Brandon Lomax took heroin from DeMond Glover's stash, it wasn't asking for permission. It was simply telling DeMond Glover, hey, I needed to borrow 50. I needed that heroin, and that's what happened. Without DeMond Glover giving an okay, giving permission, having to tell him where the heroin would be stored, Brandon Lomax knew that. He knew he had that ability to rely upon DeMond Glover. They certainly, although they had separate sources, they kept each other informed of the status of their sources of supply. The evidence at trial was that DeMond Glover drove up north to meet with his source of supply, and on the way back, within an hour, he's on the phone with Brandon Lomax relaying, hey, here's what happened in this meeting. I told him we didn't want to owe money. We, meaning Brandon and DeMond Glover, we don't want to have a credit that we owe this particular source. I told him that. And that's what Brandon is being told by DeMond Glover shortly after that meeting. They did keep each other apprised of the customers that they had. There was at least one phone call mentioned in the brief that Fat Fat, who was one of the customers that was involved in this conspiracy, Fat Fat want his stuff. He's relaying that to Brandon. Hey, somebody's got to take care of this customer. We need to keep, we need to keep him as a customer. So I think, yes, Your Honor, it certainly was a very coded conversation that would occur between these two parties due to the longstanding nature of their relationship. But the fact is, it was very clear from the very brief conversations that they did have, they knew what was going on with these coded brief conversations. And there was certainly a mutual reliance. I think it shouldn't be omitted the fact that certainly other people believed that they were in a conspiracy. And I mentioned that, specifically the phone call that Kenneth Johnson, who worked at Spray & Auto, that phone call that he made to Anthony Lomax right after DeMond Glover was interdicted on the highway. He calls Anthony Lomax because he wants to know, hey, is Brandon okay? Well, why would DeMond Glover getting interdicted up north on the highway have anything to do with Brandon from Kenneth Johnson? He knows they're in a conspiracy and he knows to find out whether Brandon Lomax is in trouble, he can call Anthony Lomax, another partner in that conspiracy. Anthony will know. He also relays that the block is hot, meaning Spray & Auto, he believes, is being watched by law enforcement. Why does he have to tell Anthony Lomax about Brandon Lomax's property being watched? Because he is in a conspiracy, Anthony, he is in a conspiracy with Brandon, and they utilize jointly that Spray & Auto as the location where they all three can distribute their heroin. Can I ask you just a procedural history question? Did the government initially propose the buyer-seller instruction in their set of instructions? We did not, Your Honor. We did not. And certainly we would have objected to it had it been issued. We didn't think under the facts it was appropriate. But no, we did not include that, Your Honor. Unless there are any further questions, I thank the Court very much for its time. Thank you. Just a few brief additional comments, Your Honors. An instruction should be given when it reflects a theory of defense that's supported by the evidence. And I think often in these cases, courts are confused because they want to balance the evidence when trying to decide whether or not an instruction should be given. This is not a balancing test. I think this is solely looking at whether the evidence that the defense presented and relied on rose up to an amount that was ample enough to warrant that instruction. And here we believe we've shown that. As I indicated earlier, we believe there was sufficient evidence from which a rational juror could find that the defense in which Mr. Anthony Lomax was presenting was established in the record, thus warranting the jury instruction. And because the District Court did not give him that opportunity to present that instruction to the jury, we believe he was denied a fair trial. If there are no further questions, thank you.  All right. Well, thanks everyone. That case will be taken under advice. Thank you. And Mr. Garcia and Mr. Riggins, you were appointed. And you have the deep thanks of the Court for taking the appointment and for doing an excellent job for your clients. Thank you so very much. And we always thank the government. Thank you. We're going to take a five-minute break. Okay? So all of you can take a five-minute break.